# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| ESTATE OF TERRELL EASON, deceased, by DEBORAH EASON, his aunt and independent administrator, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 18 C 5362 |
| P.O. LARRY LANIER #16195, P.O. DAVID TAYLOR #18525, and the CITY OF CHICAGO, a municipal corporation, | ) ) ) ) | Judge Joan H. Lefkow |
| Defendants. | ) ) | |

## OPINION AND ORDER

Terrell Eason was shot and killed by Chicago Police Officers Larry Lanier and David Taylor. Eason's estate, by Eason's aunt, Deborah Eason, brought this action against Lanier and Taylor, alleging constitutional violations under 42 U.S.C. § 1983, and state law claims for wrongful death, funeral and burial expenses, and indemnification by the City of Chicago for any judgment against Lanier and Taylor. (Dkt. 52.)[1] Defendants moved for summary judgment on all claims under Federal Rule of Civil Procedure 56. For the following reasons, summary judgment is entered for Lanier and Taylor on qualified immunity grounds and the court relinquishes supplemental jurisdiction over the state-law claims.

## BACKGROUND

After defendants filed their motion for summary judgment (dkt. 107) and statement of facts (dkt. 108) under Rule 56 and Local Rule 56.1, Eason filed a response to the motion (dkt.

---

[1] The survival action claim in count III and the *Monell* claim in count V were previously dismissed. (Dkts. 89, 94.)

115) and a response and statement of additional facts (dkt. 114). In reply, defendants raised

certain deficiencies in Eason's response and statement of additional facts. (Dkt. 125.) Eason was

granted leave to refile an amended response to correct those deficiencies and to file a sur-reply.

(Dkt. 126, 127.) Eason filed an amended response, amended Local Rule 56.1 responsive

statement with additional facts, and sur-reply. (Dkts. 128, 129, 130.) Eason's amended Local

Rule 56.1 responsive statement was stricken for including, for the first time, additional facts

beyond those included in his original Local Rule 56.1 responsive statement (dkts. 134, 135), but

he was granted leave to assert those additional facts (dkt. 138). Eason filed a second amended

Local Rule 56.1 responsive statement with those additional facts (dkt. 139), to which defendants

replied (dkt. 142).

Thus, the following factual assertions come from defendants' Local Rule 56.1 statement

of facts (dkt. 108, "DSOF") and Eason's second amended response to defendants' Local Rule

56.1 statement of facts and additional facts (dkt. 139, "PSOF").[2]

## I.    Federal Rule of Civil Procedure 56 and Local Rule 56.1 statements of undisputed material facts

At the outset, there are several discrepancies and disputes in the parties' Local Rule 56.1

statements that require clarification or resolution before determining the undisputed facts on

summary judgment. When considering whether a party is entitled to summary judgment under

Rule 56(a), the court relies on the undisputed material facts as set forth by the parties. Rule 56

and Local Rule 56.1 govern how parties must present factual matters in supporting or opposing

summary judgment. Under Rule 56(c)(1), parties must support both factual assertions and

disputes of factual assertions with citation to admissible record evidence. Local Rules 56.1(a)(2)

---

[2] Where relevant, the parties' responses to each other's asserted facts are noted as "DRPSOF" (dkt. 142) and "PRDSOF" (dkt. 139). The 4-minute, 10-second video from Taylor's body-worn camera (dkt. 110) is cited as "Video at __."

and (d) further require the movant to submit a statement of material facts with supporting citations in a specific numbered-paragraph form. Local Rules 56.1(b)(2) and (e) require the non-movant to file a response to each numbered paragraph in the moving party's statement; where it disputes a fact, it must include references to the record evidence on which it relies. Under Local Rule 56.1(b)(3), the non-moving party may set forth additional material facts in its response. The court is "entitled to . . . strict compliance with" Local Rule 56.1 and has discretion to strike or consider improperly asserted facts. *Stevo* v. *Frasor*, 662 F.3d 880, 886–87 (7th Cir. 2011).

The following analysis of the parties' factual assertions requires some familiarity with their respective views on what the undisputed evidence establishes. For their part, defendants argue that both Lanier and Taylor fired their weapons after Eason had first stumbled to the ground, on his own, and then stood back up with gun in hand and continued to run, all while in the backyard of 4730 W. Fulton Ave. In opposition, Eason attempts to establish that either the evidence does not conclusively show or it is disputed whether he was shot while on the ground on his hands and knees, following his stumble, before he had stood up with the gun.

### A.     Eason's response to defendants' asserted facts

In response to defendants' Local Rule 56.1 statement of facts, Eason admitted to most of them but with qualifications. He disputes paragraphs 30, 36, and 54.

As a preliminary matter, Eason's response to defendants' numbered paragraphs is off by one. *Compare* dkt. 108 at 1–8 (60 paragraphs) *with* dkt. 139 at 1–9 (59 paragraphs).[3] The error occurred at paragraphs 55 and 56 where Eason combined them into one paragraph (PRDSOF ¶55): "Officer Lanier did not continue to discharge his weapon" (DSOF ¶55) and "Defendant

---

[3] Defendants also made an immaterial mistake in their response to Eason's Local Rule 56.1 statement of additional facts by mislabeling paragraph 38 as "37," resulting in two paragraphs labeled 37. (Dkt. 142 at 20–21.) The mislabeled paragraph 37 is properly construed and cited here as paragraph 38.

Officers went over the radio immediately to request an ambulance when Eason was shot" (DSOF ¶56). Eason admitted the combined paragraph, so it is thus construed as such.

Moving on, Eason admits to many of defendants' asserted facts with the qualification that Lanier and Taylor "testified to such after [they were] sued" (PRDSOF ¶¶17, 27, 28, 31, 33, 34, 35, 44, 47, 49, 50, 51) and notes in another place that "there is no audio to verify" certain testimony (PRDSOF ¶41). Those qualifications do not create a disputed issue of fact, because they do not "cite specific evidentiary material" — *e.g.*, declarations, deposition testimony, video — "that controverts the asserted fact." LR 56.1(e)(3). Rather, they merely suggest metaphysical doubt about it. *See infra* Legal Standard. The failure to cite admissible evidence to support a disputed fact renders that fact undisputed. *See Curtis* v. *Costco Wholesale Corp.*, 807 F.3d 215, 218–19 (7th Cir. 2015).

For admissions that also "deny that the video reflects this" (PRDSOF ¶¶25, 39, 44, 46, 48, 49, 54), Eason did not provide a counter-explanation of what he believes the video shows, if not what defendants assert. Despite the failure to do so, video evidence will be relied on only to the extent that it establishes the events "with confidence" and "beyond reasonable question," while testimonial explanations of the video will be relied on to the extent they are consistent with the video. *See infra* Legal Standard.

Next, defendants' paragraph 52, although admitted by Eason, is not supported by the cited video time stamp at the 5-second mark from Taylor's body-worn camera, causing a discrepancy between what exactly is undisputed and disputed in that paragraph. Paragraph 52 states that Lanier "was positioned in the rear yard of 4732 W. Fulton to the right of the tree and west of Eason when he discharged his weapon," citing in support the 5-second mark of the video

and paragraphs 11 and 14 of Lanier's declaration. (DSOF ¶52.) Eason admits to Lanier's stated positioning "and that Lanier discharged his weapon at 00:00:05." (PRDSOF ¶52.)

Paragraph 52 does not purport to assert that Lanier fired his weapon at the 5-second mark, and neither the video nor declaration establishes that fact. Although the camera's audio had not started,[4] at the 5-second mark Eason is seen picking himself up off the ground. According to other evidence not disputed by Eason (*see* DSOF ¶¶25, 32, 33, 39, 44, 50), Taylor, who fired his weapon first, had not yet fired until Eason was back on his feet, holding a gun, and running, which occurred after the 5-second mark. Rather, the 5-second mark of the video shows Taylor landing in the backyard of 4730 W. Fulton Ave., after jumping over a chain-link fence and Eason can be seen on his hands and knees starting to pick himself up off the ground. (Video at 0:00:05; DSOF ¶22.) According to undisputed statements from Taylor, he fired his weapon eight consecutive times after he saw Eason back on his feet and running again, which is around the 7-second mark. (DSOF ¶¶32 (citing Video at 0:00:08–09), 33, 35 (citing Video 0:00:07–10).)

Lanier's declaration also does not establish that he fired the first shot or did so at the 5-second mark of the video. Paragraph 11 of the declaration states that "[a]t the time of the shooting, [he] was located to the west of Eason in the rear yard of 4732 W. Fulton Ave." (dkt. 108-5 at 3, ¶11), which was the backyard adjacent to one in which Eason was shot. And paragraph 14, which cites the 5-second mark of the video, stated that he "was still positioned to the right of the tree captured on the body worn camera when I discharged my weapon." (*Id.* at ¶14). To the extent that there is ambiguity in paragraph 14 as to whether Lanier is stating that either he fired his weapon at the 5-second mark or the citation to the 5-second mark is to show

---

[4] Taylor turned on his camera after the shooting. (Dkt. 108-3 at 21 (71:8–10); PSOF ¶25.) The camera had a 30-second retract buffer, allowing it to reach back to retain the 30 seconds of video (but not audio) upon being activated. (PSOF ¶26.) Lanier failed to turn on his body camera. (PSOF ¶28.)

the tree that he was standing next to, paragraph 13 resolves any ambiguity by stating that he "did not discharge [his] weapon when [he] saw Eason on all fours in the process of standing up with a gun in his right hand" (*id.* at 3, ¶13), which, again, is around the 5-second mark. Consistent with that, Lanier's deposition confirms the order of events:

(1) Lanier observed Eason in the backyard of 4730 W. Fulton Ave "on all fours in the process of standing up" (dkt. 108-2 at 13 (42:13–14));

(2) he observed Eason on his feet moving with gun in hand (*id.* at 14 (46:14–20));

(3) he heard a shot (Taylor's) (*id.* (48:7–11));

(4) he fired his weapon (*id.*).

Thus, defendants' paragraph 52 asserts *where* Lanier was when he fired his weapon, not *when* he did so, and that fact is undisputed.

Eason also objects to defendants' asserted fact in paragraph 36 that "[o]nce Eason fell to the ground after being shot, Officer Taylor did not continue to discharge his weapon." (DSOF ¶36.) Eason claims that "it is unclear from the record if [Eason] was shot while on the ground the first time." (PRDSOF ¶36.) Again, Eason cites no record evidence supporting the assertion that he was shot while on the ground the first time. Regardless, Eason's argument that the record is "unclear" as to when Taylor *first fired* his weapon does not dispute defendants' assertion regarding when Taylor *stopped firing* his weapon. Paragraph 36 stands undisputed.

Eason disputes defendants' asserted fact in paragraph 30 that "Officer Taylor feared that Eason would kick in the door to a civilian's home because Eason ran to a location where he did not have a clear escape." (DSOF ¶30 (citing dkt. 108-3 at 18 (60:16–23)).) Eason disputes Taylor's claimed fear by noting that he first articulated this fear at his deposition, two years after the shooting, and Eason suggests that Taylor could not have feared that he would break into the home because he had testified earlier to the Civilian Office of Police Accountability (COPA) in

2018 that "[Eason] had a clear out, without having to run towards [him and Lanier], to go directly eastbound and jump that fence, and keep moving, which he did not do." (PRDSOF ¶30 (citing dkt. 119 at 35 (33:3–11)).)

Defendants' supporting evidence for paragraph 30 is Taylor's speculation about what Eason might do after standing up with his gun and continuing to move. The cited portion of the deposition transcript reads:

> Q So, if there was an escape route -- because you indicated you were afraid he was going to get trapped and turn around, correct?
> A [Taylor] Or, for all I know, he was going to kick in the door to someone's home and -- I don't know what he was going to do.

(Dkt. 108-3 at 18 (60:16–21)).) This testimony establishes, at most, that Taylor was unsure what Eason was going to do when he stood up, but he was aware of several possibilities, including the possibility that Eason may enter the home at 4730 W. Fulton Ave. Taylor's COPA interview, which Eason believes contradicts Taylor's deposition testimony, actually is consistent with his deposition testimony and clarifies his fear. There, Taylor explained that he believed that among the possible options Eason had in the backyard of 4730 W. Fulton Ave, the only one that would not have presented an "armed encounter" with him, Lanier, or a civilian was for Eason to hop the fence from 4730 W. Fulton Ave. over to the backyard of 4728 W. Fulton Ave., but he "didn't take that option, to run, if he was choosing to flee." (Dkt. 119 at 40–42.) Paragraph 30 stands undisputed, although it is not a complete representation of Taylor's assessment of Eason's potential options in the moment.

Eason also disputes the asserted fact in paragraph 54 that, "[w]hen Eason fell to the ground after he was shot, the gun was still in his right hand," which cited the 10-second mark of the video. (PRDSOF ¶54.) Eason denies this assertion by citing seconds 10 through 23 of the video and Taylor's testimony from his COPA interview where he stated that he did not know if

the gun stayed in Eason's hand when he fell. (*Id.* (citing dkt. 110 at 0:00:10–23; dkt. 119 at 47 (45:8–12).) Between the 10- and 11-second mark, it in fact shows Eason clinging to the gun while falling to the ground. Once on the ground, it is not clear when he let go of the gun, but by the time that Taylor approaches Eason at the 23-second mark, Eason is no longer holding the gun and it is seen next to him in the grass a few seconds later. Paragraph 54 stands undisputed because there is no evidence contradicting the statement that Eason had his gun in his right hand *as he fell to the ground*.

### B. Defendants' response to Eason's statement of additional facts

Defendants object to nearly every additional asserted fact (all but paragraphs 1, 6, 23, 30, 33, 36) on the basis that they are not truly additional material facts because they do not require denial of summary judgment. True, many of the asserted additional facts are similar to defendants' original asserted facts, just phrased differently, or are not material. Notwithstanding those objections and qualifications, though, defendants ultimately admit to all additional facts except paragraphs 6, 23, 33, and 36. The following analysis addresses those denials, and paragraphs 7 and 11, because the cited supporting evidence does not support them.

Beginning with paragraph 6, it asserts that, "After he fell, Mr. Eason did not turn and point the gun at Taylor." (PSOF ¶6 (citing dkt. 108-3 at 15 (46:3–8)).) Defendants move to strike this asserted fact on the basis that it mischaracterizes Taylor's testimony and is thus unsupported by it. That cited transcript reads:

> A [Taylor] I would say approximately the middle.
> Q Okay. And what was he --
> A As far as distance from me, middle. Yeah.
> Q Okay. And what was he doing?
> A He was on his two feet with a semi-automatic handgun in his hand.

(Dkt. 108-3 at 15 (46:3–8).)

8

By negative inference, the asserted fact that Eason did not turn and point a gun at Taylor is accurate. But inference is unnecessary because elsewhere, although not cited in support of paragraph 6, Taylor indeed testified that Eason "never turned around and pointed the gun at [him]." (Dkt. 108-3 at 21 (70:6–7).) Paragraph 6 stands as undisputed.

Eason similarly asserts in paragraph 23 that "Taylor said if Mr. Eason turned and pointed the gun, he would be a threat, but he acknowledged that Mr. Eason never did that." (PSOF ¶23.) Again, it is undisputed that Eason "never turned around and pointed the gun at [him]." (Dkt. 108-3 at 21 (70:6–7).) But the deduction that Taylor did not perceive Eason as a threat is not supported by any evidence. Preceding his testimony that Eason never turned around and pointed the gun at him, Taylor had been testifying about his fear that Eason was going to use his gun because he was cornered and could fire it at him without turning around. (Dkt. 108-3 at 20 (68:21–69:24).) The properly supported assertion in paragraph 23 that Eason never turned around and pointed the gun at Taylor is redundant of paragraph 6, and undisputed.

In paragraph 33, Eason asserts that, "[a]fter being shot, Mr. Eason collapsed in the backyard of 4728/4730 W. Fulton Avenue." (PSOF ¶33 (citing Video at 0:00:03–11).) Defendants object to this paragraph as unsupported by the record and they assume that Eason is attempting to establish with this assertion that his first fall was caused by his being shot. (DRPSOF ¶33.) But the asserted fact does not expressly state that, even though the cited video evidence includes both Eason's first fall (not caused by being shot) and second fall (caused by being shot). The reference to 4728 W. Fulton Ave. is stricken because no evidence shows Eason leaving the backyard of 4730 W. Fulton Ave. after being shot and falling to the ground.

As for paragraph 36, Eason asserts that "[t]he Medical Examiner labeled one of the gunshot wounds Mr. Eason sustained as '2,' which she concluded entered through Mr. Eason's

lower left back and exited through the right side of his back, in the shoulder blade area. Ex. K at 3 and CITY 001910 [dkt. 118 at 5, 28]. The gunshot wound's path was from left to right and upwards (toward the head). Ex. K at 3 [dkt. 118 at 5]." (PSOF ¶36.) Defendants object to Eason's inclusion of "in the shoulder blade area and "toward the head," which are conclusions not specifically made in the medical examiner's report. (DRPSOF ¶36.)

The relevance of those two additions, as explained more fully in the analysis, is that Eason seeks to establish that he was first shot while on the ground on his hands and knees, before he stood back up and continued running. The characterization that one of the gunshot wounds was "in the shoulder blade area" is a consistent characterization of the medical examiner's report and its illustrations of the gunshot wounds. (Dkt. 118 at 28.) Eason's interpretation of the path for gunshot wound no. 2 as "left to right and upwards" as "towards the head" also is not an inconsistent characterization, although drawing a straight line between the entrance and exit points reveals a path more accurately described as towards the right shoulder, not the head. Notably, however, the medical examiner offered no opinion in her report or deposition testimony as to "where the shooter was in relation to [Eason] when he was shot." (Dkt. 108-6 at 20 (69:15–20).) Paragraph 36 stands undisputed, to the extent that it asserts material in the medical examiner's report.

Last, although defendants admitted to them, Eason's additional facts in paragraphs 7 and 11 are not supported by the cited evidence and must be stricken. Paragraph 7 states that "Taylor hopped the fence after he switched on his bodycam." (PSOF ¶7.) The cited evidence is Taylor's testimony about not receiving his weapon back (Dkt. 108-3 at 9 (22:16–19)); it has nothing to do with his body camera. In fact, Taylor testified that he turned on his camera after he fired his weapon (*id.* at 21 (71:8–10)) and Eason's paragraph 25 states the same. For paragraph 11's

assertion that "Lanier and Taylor were in the yard of 4732 W. Fulton [Ave.] and said incident took place in the yard of 4730 [W. Fulton Ave.]," Eason cites a portion of Tedrick Orr's testimony about Eason's child "TJ" (dkt. 108-8 at 8 (23:13–18)), which has nothing to do with the asserted fact or anything material.

## II.     Eason's death, as told by the undisputed facts

With those issues resolved, what follows are the undisputed facts, construed in the light most favorable to Eason. Where video is available, the video stamp is cited along with the undisputed factual assertions.

On July 3, 2018, Lanier and Taylor were partners, working as tactical officers on the Chicago Police Department's 11th district tactical team. (DSOF ¶6, 7.) They, along with Officer Lorring, were in uniform, equipped with body-worn cameras, and on patrol in an unmarked car. (DSOF ¶7; PSOF ¶32.)

The officers received a radio dispatch from the Office of Emergency Management and Communications (OEMC) about a black male armed with a gun on the 4700 block of W. Fulton Ave. (DSOF ¶8.) The OEMC dispatcher stated, "Person with a gun 4709 W. Fulton from an anonymous caller . . . last seen wearing an orange hat, white t-shirt, beige pants, beige timberland shoes." (DSOF ¶9.)

Another police unit came over the radio and stated that they were not far from the location and would follow up on the dispatcher's information. (DSOF ¶10.) At some point later, the unit came back over the radio and stated that they located the person matching the description given by the dispatcher. (DSOF ¶10.) Not long after that, an officer stated over the radio that he was chasing an armed individual and that the armed individual was running back towards Fulton Ave. (DSOF ¶11.)

Lanier and Taylor activated their emergency lights and drove to the 4700 block of West Fulton Ave. (DSOF ¶12.) Another police unit came over the radio and informed them that the individual was running with a gun in the alley. (DSOF ¶13.)

Lanier and Taylor arrived on the 4700 block of West Fulton Ave., exited their vehicle and went northbound through the front gangway of 4732 West Fulton Ave. (DSOF ¶14.) It was still daytime and light outside. (PSOF ¶30; *see generally* Video.) Through the gangway, Taylor ran towards the back alley, with Lanier trailing him. (DSOF ¶16, 37.) As Taylor ran, he observed a person matching the description given by the OEMC dispatcher standing in the alley behind 4730 West Fulton Ave., facing southbound. (DSOF ¶16.) That person was Eason, and he looked in Taylor's direction. (DSOF ¶17.)

Taylor continued running toward a back fence, behind which Eason stood in the alley. (Video 0:00:00–01; DSOF ¶18; PSOF ¶2.) Before Taylor could jump the fence, he heard the sound of Eason jumping the fence into the backyard of 4730 W. Fulton Ave. (DSOF ¶19; PSOF ¶¶4, 5.) So he turned around and ran to a chain link fence separating the backyards of 4732 and 4730 W. Fulton Ave. (Video at 0:00:02; DSOF ¶20; PSOF ¶5.) He observed Lanier standing a little in front of him in the gangway of 4732 W. Fulton Ave. and Eason, holding a handgun, in the adjacent yard. (Video at 0:00:02–03; DSOF ¶20, 38; PSOF ¶¶8, 10.) While jumping the chain link fence, he observed Eason falling to the ground, the gun still in his right hand. (Video at 0:00:03–05; DSOF ¶¶22, 24; PSOF ¶3.) Lanier looked on from the backyard at 4732 W. Fulton Ave. and saw Eason, on all fours, beginning to stand up with a gun in his hand. (Video at 0:00:05–08; DSOF ¶¶39, 40.)

All the while, from the moment that they encountered Eason, both Lanier and Taylor were commanding him to drop the gun. (DSOF ¶¶21, 23, 41, 42; PSOF ¶13.) Eason did not drop

the gun. (Video at 0:00:05–10; DSOF ¶¶25, 43; PSOF ¶24.) After Eason fell and got back up, still holding the gun in his right hand, Taylor continued to tell Eason to put the gun down. (DSOF ¶¶25, 26; *see* Video at 0:00:05–10.)

In the moment, Taylor felt like he was being engaged by Eason. (DSOF ¶27.) Eason had ignored his commands to put down the gun, and so he feared that Eason would either turn around and shoot him, Lanier, or civilians. (DSOF ¶¶28, 29, 30, 31.) Taylor believed that Eason had nowhere to go that would not present an armed encounter with himself, Lanier, or a civilian, other than jumping another fence over to the adjacent backyard at 4728 W. Fulton Ave., but he did not do that. (DSOF ¶30; dkt. 119 at 40–42.)

Back on his feet, Eason did not turn and point or raise the gun at the officers. (Video at 0:00:08–10; PSOF ¶¶9, 18, 23.) He ran southbound, and both officers observed his right hand, holding the gun, gesticulating backward and forward in his pumping arm. (Video at 0:00:08–10; DSOF ¶¶32, 44.) Taylor was positioned behind Eason (Video 0:00:06–10; DSOF ¶35), and Lanier was parallel to him to the west (DSOF ¶¶44, 49, 52; PSOF ¶12). Lanier perceived Eason to be facing him and he saw Eason look in his direction (DSOF ¶¶45, 46). He believed that Eason was moving the gun in his and in Taylor's direction. (DSOF ¶47.)

Eason took three or four steps towards the house at 4730 W. Fulton Ave., briefly looked over his right shoulder, and then Taylor fired his weapon at Eason, eight times in uninterrupted succession, until Eason was on the ground. (Video 0:00:07–11; DSOF ¶¶25, 33, 36; PSOF ¶¶16, 19, 21, 22, 35.) Lanier, unaware of Taylor's exact location in the yard, fired his weapon twice upon hearing a gunshot. (DSOF ¶¶50, 51, 53; PSOF ¶¶14, 17, 20, 29, 31.) Both officers feared for their own lives and those of others when they fired their weapons. (DSOF ¶¶31, 33, 34, 51, 53.)

After being shot, Eason fell heavy to the ground, the gun gripped in his right hand. (Video at 0:00:09–10; PSOF ¶33.) He turned over on his back and laid there. (Video at 0:00:11–20.) The officers radioed for an ambulance. (Video at 0:00:20–24, 0:00:30–35; DSOF ¶56.) They approached Eason. (Video at 0:00:20–27.) Eason's right arm lay across his face and the gun was in the grass next to him. (Video at 0:00:26–28.) A few minutes later Taylor asks Lanier, "you shot too, right?" and stated that "he wasn't putting it down." (Video at 0:02:10–15.)

The medical examiner found that six bullets hit Eason, causing his death. (DSOF ¶57; PSOF ¶34.) The order in which those bullets hit him was not determined. (Dkt. 118 at 4.) Two gunshot wounds were on Eason's front side, with one on the left side of the abdomen and the second on the right side of the chest. (DSOF ¶¶59, 60; dkt. 118 at 28.) Four bullets entered his back, with two near the lower back, one below his shoulder blade, and another in his left elbow. (Dkt. 118 at 28.) One of the bullets that entered Eason's lower back also exited from his back, near his right shoulder blade. (PSOF ¶36; Dkt. 118 at 5, 28.)

## LEGAL STANDARD

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court views all facts in the light most favorable to the nonmovant and draws all reasonable inferences in his favor. *See Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The movant must show that there is no genuine dispute of fact preventing the entry of judgment in his favor as a matter of law. *See Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323 (1986). To avoid summary judgment, the non-movant must do more than raise "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586. Rather, he "must

present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986). To create a genuine dispute, the evidence must be "such that a reasonable jury could return a verdict for the [non-movant]." *Id.* at 248.

Where, as here, there is video evidence in the record, the court may "take stock" of it "without favoring the nonmovant where the video contradicts his view of the facts." *Lopez* v. *Sheriff of Cook Cty.*, 993 F.3d 981, 984 (7th Cir. 2021) (citing *Scott* v. *Harris*, 550 U.S. 372, 378–81 (2007); *Horton* v. *Pobjecky*, 883 F.3d 941, 944 (7th Cir. 2018)). Video, however, is not always conclusive; it can be relied on only to the extent that it establishes the events "with confidence" and "beyond reasonable question." *Id.* (quoting *Johnson* v. *Rogers*, 944 F.3d 966, 967, 969 (7th Cir. 2019)) (internal quotations omitted).

Further, any defendant's testimony about what happened requires "a fairly critical assessment of the forensic evidence, the officer's original reports or statements and the opinions of experts to decide whether the officer's testimony could reasonably be rejected at a trial," given that the person who could have contradicted that testimony is deceased. *Plakas* v. *Drinski*, 19 F.3d 1143, 1147 (7th Cir. 1994).

## **ANALYSIS**

I.    **Lanier and Taylor are entitled to qualified immunity because Eason has not shown that the undisputed facts show a violation of clearly established law.**

Defendants argue that they are entitled to summary judgment on the merits of the excessive force claims and under the doctrine of qualified immunity. Officers are entitled to qualified immunity in § 1983 actions unless (1) they violated a federal statutory or constitutional right and (2) their conduct violated clearly established law at the time. *See Dist. of Columbia* v. *Wesby*, 138 S. Ct. 577, 589 (2018). If either inquiry is answered in the negative, the defendant is

protected by qualified immunity. *See Koh* v. *Ustich*, 933 F.3d 836, 844 (7th Cir. 2019). The

Supreme Court has encouraged courts to "'think hard, and then think hard again,' before

addressing both qualified immunity and the merits of an underlying constitutional claim." *Wesby*,

138 S. Ct. at 589 (quoting *Camreta* v. *Greene*, 563 U.S. 692, 707 (2011)). Accordingly, courts

have discretion to decide first whether the officers violated clearly established law. *See Pearson*

v. *Callahan*, 555 U.S. 223, 236–43 (2009).

Starting this analysis with the second prong of qualified immunity, Eason had the burden

to show that Lanier's and Taylor's conduct violated clearly established law. *See Dockery* v.

*Blackburn*, 911 F.3d 458, 466 (7th Cir. 2018). In general, the use of force, including lethal force,

by law enforcement during a seizure of a person is governed by the prohibition against

unreasonable seizures under the Fourth Amendment. *See Tennessee* v. *Garner*, 471 U.S. 1, 7

(1985). Excessive force is constitutionally unreasonable. *See Graham* v. *Connor*, 490 U.S. 386,

395 (1989).

The standard for determining whether the force used was excessive asks "whether the

totality of the circumstances justified a particular sort of . . . seizure," *Garner*, 471 U.S. at 8–9,

assessed from the perspective of a reasonable officer on the scene, *see Graham*, 490 U.S. at 396.

It "requires a careful balancing of the nature and quality of the intrusion on the individual's

Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at

396 (internal quotations omitted). This evaluation considers "the severity of the crime at issue,

whether the suspect poses an immediate threat to the safety of the officers or others, and whether

he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. Also potentially

relevant is "whether the individual was under arrest or suspected of committing a crime; whether

the individual was armed; and whether the person was interfering or attempting to interfere with

the officer's duties." *Dawson* v. *Brown*, 803 F.3d 829, 833 (7th Cir. 2015). This assessment

"includes the period just before and during the shooting." *Smith* v. *Finkley*, 10 F.4th 725, 739

(7th Cir. 2021).

Deadly force may not be used unless "the officer has probable cause to believe that the

armed suspect . . . 'poses a threat of serious physical harm, either to the officer or to others,' or

. . . 'committed a crime involving the infliction or threatened infliction of serious physical harm'

and is about to escape." *Muhammed* v. *City of Chi.*, 316 F.3d 680, 683 (7th Cir. 2002) (quoting

*Garner*, 471 U.S. at 11–12). This case arguably falls in the former category, where a "person of

interest threatens the officer with a weapon," thus displaying "the risk of serious physical harm

to the officer[.]" *King v. Hendricks Cty. Comm'rs*, 954 F.3d 981, 985 (7th Cir. 2020). "[W]hen

an officer believes that a suspect's actions [place] him, his partner, or those in the immediate

vicinity in imminent danger of death or serious bodily injury, the officer can reasonably exercise

the use of deadly force." *Muhammed*, 316 F.3d at 683 (quoting *Sherrod* v. *Berry*, 856 F.2d 802,

805 (7th Cir. 1988) (en banc) (emphasis omitted)). A warning before using deadly force is best,

but required only "where feasible." *Garner*, 471 U.S. at 11–12. This calculus contemplates "the

fact that police officers are often forced to make split-second judgments — in circumstances that

are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a

particular situation." *Graham*, 490 U.S. at 396–97.

Clearly established law, however, must not be defined at this high level of generality. *See*

*Kisela* v. *Hughes*, 138 S. Ct. 1148, 1152 (2018). Under the general parameters described above,

to avoid qualified immunity, the right to be free from deadly force in a particular scenario must

be so clearly established that "every reasonable official would have understood that what he is

doing violates that right." *Reichle* v. *Howards*, 566 U.S. 658, 663–65 (2012) (cleaned up).

"[S]pecificity is especially important in" excessive-force cases because they are particularly fact-dependent and "it is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply," given the "hazy border between excessive and acceptable force." *Mullenix* v. *Luna,* 577 U.S. 7, 12 (2015) (per curiam) (cleaned up). "[T]hus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue." *Kisela,* 138 S. Ct. at 1153 (cleaned up). Law is clearly established on an excessive force claim if there is a "closely analogous case" holding that the specific type of force used by the defendants is excessive or there is "a general constitutional rule already identified in the decisional law [that] applies with obvious clarity to the specific conduct in question." *Cibulka* v. *City of Madison*, 992 F.3d 633, 639–40 (7th Cir. 2021) (internal quotation marks and alterations omitted). This is "a high bar," "protect[ing] 'all but the plainly incompetent or those who knowingly violate the law.'" *Lopez*, 993 F.3d at 988 (quoting *Malley* v. *Briggs*, 475 U.S. 335, 341 (1986)).

Here, Eason has not met his burden to show that in July 2018 it was clearly established that the officers' use of deadly force was unlawful. Eason defines the relevant clearly established law as a right to be free from deadly force for "simply holding a firearm" and "not wield[ing] the weapon in any way that can be interpreted as threatening," while moving "away from Taylor." All would agree that undisputed facts show a confrontation that is both dangerous and heartbreaking. But the scenario as Eason describes it is not close to what the undisputed facts, viewed in a light favorable to him, show. The court has spent many hours analyzing facts that Lanier and Taylor had seconds to analyze, *see Horton*, 883 F.3d at 950, and there is no moment that could reasonably be interpreted as Eason merely holding a firearm in a non-threatening manner. That is not to say that defendants' characterization of events is entirely fair or accurate.

The undisputed facts show, rather, that before Lanier and Taylor encountered Eason, they were responding to a dispatch about an armed individual and knew he was evading police. (DSOF ¶¶8, 9, 10, 11, 13.) They saw Eason with the gun once they were in the backyard of 4730 W. Fulton Ave. (Video at 0:00:00–03; DSOF ¶¶20, 38; PSOF ¶¶5, 8, 10.) They told him to drop it. (DSOF ¶21; PSOF ¶13.) He did not and continued to flee. (Video at 0:00:05–10; DSOF ¶¶25, 43; PSOF ¶24.) He fell down but stood back up with the gun, ignoring further commands to drop the gun while continuing to run into a confined area, rather than toward the one escape route to the neighboring backyard. (Video at 0:00:05–010; DSOF ¶¶22, 24–26, 39, 40; PSOF ¶3.) Before they fired, Eason did not turn around and point his gun at the officers, but the officers saw Eason's gun in his pumping arm, swaying in various directions, including theirs, as his head turned slightly to his right, also in their general direction. (Video at 0:00:08–10; DSOF ¶¶32, 44–47; PSOF ¶¶9, 18, 23.) The officers fired their weapons and ceased once Eason was on the ground and they believed the threat neutralized. (Video 0:00:09–11; DSOF ¶¶33, 36, 53, 55; PSOF ¶¶16, 19, 21, 22, 35.)

Using these facts, Eason has supplied no analogous case law, and the court has found none, clearly establishing that the officers' belief that Eason's actions presented an imminent threat of harm to themselves and others was objectively unreasonable. There is, however, ample authority that is more closely analogous to the officers' use of deadly force here that suggests that their actions were objectively reasonable. In *Conley-Eaglebear* v. *Miller*, for example, the court affirmed the entry of summary judgment for an officer on an excessive force claim where the officer shot a fleeing suspect in the back after observing him draw a gun from his waistband and look back over his shoulder toward the officer; the officer "did not need to wait for [the suspect] to face him or point the gun directly at him before acting to protect himself and the

community." No. 16-3065, 2017 WL 7116973, at *2 (7th Cir. Sept. 26, 2017) (citing *Helman* v. *Duhaime*, 742 F.3d 760, 763 (7th Cir. 2014) (objectively reasonable for officer to shoot suspect who was reaching for firearm); *Henning* v. *O'Leary*, 477 F.3d 492, 496 (7th Cir. 2007) ("officers cannot be expected to wait until a resisting arrestee has a firm grip on a deadly weapon and completely freed himself from officers trying to subdue him before taking action to ensure their safety"); *Ellis* v. *Wynalda*, 999 F.2d 243, 247 (7th Cir. 1993) (noting officer would be justified to shoot suspect when he was about to throw a bag at him, up until the moment officer observed that the bag was lightweight, caused no injury, and was no immediate threat); *see also Horton*, 883 F.3d at 952 (reasonable officer would know that "suspect could have turned and produced a gun in a flash given all the facts and circumstances"); *accord White* v. *City of Topeka*, 489 F. Supp. 3d 1209, 1240 (D. Kan. 2020) (identifying cases where use of deadly force by officer who believed suspect had a gun and suspect was resisting or fleeing law enforcement, even if the suspect never threatened officer, was objectively reasonable) (citing *Jean-Baptiste* v. *Gutierrez*, 627 F.3d 816, 821 (11th Cir. 2010); *Henning*, 477 F.3d at 496; *Anderson* v. *Russell*, 247 F.3d 125, 130–31 (4th Cir. 2001); *Thompson* v. *Hubbard*, 257 F.3d 896, 898–99 (8th Cir. 2001); *Slattery* v. *Rizzo*, 939 F.2d 213, 215–17 (4th Cir. 1991); *George* v. *Morris*, 736 F.3d 829, 838 (9th Cir. 2013)).

Courts also have concluded that a suspect disobeying commands to stop or drop a weapon is a factor that reasonably supports an officer's belief that the suspect presents an imminent threat. *E.g.*, *Smith*, 10 F.4th at 739 (noting person suspected of a crime involving firearm, whom officers reasonably believed was armed, displayed "active resistance" when he fled and hid, and when found failed to obey numerous commands from different officers); *Betton* v. *Belue*, 942 F.3d 184, 193 (4th Cir. 2019) (had suspect "disobeyed a command given by the

officers, such as to drop his weapon or to 'come out' with his hands raised, [officer] reasonably may have feared for his safety upon observing [suspect] holding a gun at his side").

Two other factors here that the court has determined can support, or at least do not undermine, the reasonableness of deadly force are that the officers gave several warnings to drop the gun before firing, *see Garner*, 471 U.S. at 11–12, and they did not keep firing their weapons once Eason was on the ground, *see Plumhoff* v. *Rickard*, 572 U.S. 765, 777 (2014) ("officers need not stop shooting until the threat has ended").

Therefore, both Lanier and Taylor are entitled to qualified immunity because Eason has not shown that it was clearly established that either officer's use of deadly force in this situation was unlawful. Eason's attempt to define his conduct as merely possessing a firearm in a non-threatening way is not supported by the undisputed evidence and ignores relevant facts.

Although not specifically presented in response to defendants' qualified immunity argument, Eason also contends that there is a genuine dispute as to whether he was shot while getting up from the ground. Eason claims that a reasonable juror could find that he was shot while on the ground based on Taylor's body camera's line of sight at the 5-second mark of the video and the path of gunshot wound no. 2, using common sense, logic, and physics. He adds that the video shows him physically incapacitated once standing up and running again.

These facts describe something different than mere possession of a firearm and, for completeness, still would not change the outcome for at least two reasons. First, there is no non-speculative basis to find that Taylor shot Eason at the moment that Eason was on all fours, standing up, after his first fall. The video does not show when any bullet enters or exits Eason's body, in what order, the angle at which the bullets entered his body, or which officer's bullets caused each wound. Eason's body presents itself to the officers at several different angles

throughout the video, especially as he falls to the ground and rolls over, making it equally speculative that the bullet that caused gunshot wound no. 2 occurred at a later moment. The only evidence of the bullet's path is the medical examiner's rudimentary drawing of the bullets' entry and exit points on a not-to-scale human body outline; she did not opine on the shooter's position relative to Eason (nor was that the function of her post-mortem examination, as Eason notes) and there is no expert opinion to otherwise explain these issues. *Cf. Rios* v. *City of Chi.*, No. 15 C 3119, 2021 WL 809735, at *2 (N.D. Ill. Mar. 3, 2021) (plaintiff presented expert testimony on bullet wound path to support assertions regarding when he was shot). And it is not at all evident from the video that Eason is physically incapacitated after he stands up and continues running with the gun. Even if he were unsteady, there is no evidence showing that it is because he was shot.

Moreover, Eason's speculation that he was shot while on the ground is incompatible with other undisputed facts. Both officers stated that they did not shoot at Eason when he was on the ground the first time. And Taylor, after he had warned Eason to drop the gun once Eason stood up, fired his weapon eight consecutive times, and Lanier fired twice after hearing Taylor's gun go off. If Eason had been shot while on the ground the first time, Taylor would not have been able to give that command to drop the gun after he stood up and he would have needed to stop firing for a few moments while Eason stood back up and took several steps, before firing again.

Second, even if the facts showed that Eason was shot while on the ground the first time, the law was not clearly established that the use of deadly force at that moment was excessive. The case law that Eason supplied involving mere possession of a firearm is not analogous. Nor could his actions up until he fell and began standing up be reasonably interpreted as surrendering or complying with the officer's request to drop the gun, although he does not advance that

theory. *E.g.*, *Johnson* v. *Scott*, 576 F.3d 658, 660 (7th Cir. 2009) ("officer may not continue to use force against a suspect who is subdued and complying with the officer's orders"). Rather, at the moment Eason is picking himself up, the officers knew that Eason was armed and fleeing, he had disobeyed commands to drop the gun, and he was not taking any action that an officer should have reasonably interpreted as surrender or would otherwise show that the threat posed by his noncompliance had subsided. Those facts present a closer case on the merits, but Eason has still supplied no analogous case finding it unlawful, nor has the court found any.

In summary, the officers are entitled to qualified immunity because Eason has not shown that the law clearly established that Lanier's or Taylor's use of deadly force was unlawful. There are no genuine disputes as to the material facts precluding qualified immunity, and even if the first shot occurred when Eason claims it did, he still has not provided case law showing that the officers violated clearly established law in that scenario.

## II.      Supplemental jurisdiction over Eason's state-law claims is relinquished.

Last, defendants argue that the disposition of the excessive force claim in Lanier and Taylor's favor resolves the derivative state-law claims for wrongful death, funeral expenses, and indemnification by the City of Chicago. *See Horton* v. *Pobjecky*, No. 12 C 7784, 2017 WL 5899694, at *8 (N.D. Ill. Mar. 20, 2017). Eason argues generally that there are factual disputes precluding resolution but offers no substantive response. Having resolved the federal claims for Lanier and Taylor, the court relinquishes jurisdiction over the state-law claims. The limitations period has not expired, *see* 28 U.S.C. § 1367(d); *Artis* v. *Dist. of Columbia*, 138 S. Ct. 594, 598 (2018); significant judicial resources have not been expended on their resolution; and, because Eason has not devoted much briefing to them, their disposition is not absolutely clear. The state-law claims are therefore dismissed without prejudice.

## <u>CONCLUSION AND ORDER</u>

Defendants' motion for summary judgment is granted in favor of defendants Lanier and Taylor on the excessive force claims. The state-law claims against Lanier, Taylor, and the City of Chicago are dismissed without prejudice. The Clerk is directed to enter final judgment under Rule 58. The case is terminated.

Date: September 29, 2021

_____
U.S. District Judge Joan H. Lefkow